Our final case for the day is United States v. Ihediwa.  Good morning and may it please the court. My name is Kyle Kent and I represent defendant appellant Uzorma Ihediwa. This is a case about the difference between knowing and negligent conduct. Frankly, these two standards have little in common, but from time to time this court has had to step in and keep them separate. For instance, over the years it's repeatedly clarified the law about deliberate avoidance, because when the deliberate avoidance standard is misused or misapplied, the line between knowledge and negligence gets blurred. And that's exactly what happened in this case. But Mr. Kent, I mean, the thing that I need to hear from you on is, you know, I think you make lots of very persuasive arguments about the fact that knowing is a different standard and talking about reasonable persons and all of that doesn't suggest knowing. But in every language he knew, this district judge says, even if I'm wrong about the four-level enhancement, I am going to sentence, he roughly says, based on the 3553A factor, he says I'm going to give the same sentence no matter what. And, in fact, the 40-month sentence he selects is significantly below what the range would have been, even if you had prevailed on the four-level enhancement. So explain to me why what the judge said wasn't enough to show that this was a sentence driven by the particular characteristics of Mr. Ahedewa, not the guideline calculation. Your Honor, the court's conclusory statements that, you know, it would have ruled the same regardless, weren't enough because of a few factors. I think most importantly, the court didn't acknowledge that the government's recommendation would have dropped by a little bit more than two years, by 27 months. We know that district court judges tend to give particular weight to the party's recommendations. You think that's true of this district judge? Yes, Your Honor. In my office's experience, this district court judge gives particular weight to the party's recommendations. But he goes below, though. I mean, he's clearly listening to both the mitigating evidence about Mr. Ahedewa, but he also is very troubled by, as he says, the serious nature of the conduct. And he has kind of a back and forth. He doesn't go on for 15 pages. I understand that. But he talks about a lot of very particular things. He says, I appreciate Mr. Ahedewa may not have fully appreciated just how serious the substances were, but he's on notice after April 2019. And I don't think notice as a 3553A consideration is off the table. It just doesn't support the formal guidelines enhancement. And he knows they're deadly. And the judge just thinks that just this recklessness that he has is an all-the-facts-in-circumstances kind of consideration. Or do you think that that's not even possible under 3553A? Well, I think that although it might be a 3553A consideration, that that sort of broad brush approach to 3553A is similar to what the court did in Asbury, where the district court judge said, quote, and if I made an error in the guideline calculation in terms of offense level, that would not affect my sentence. I'm basing my sentence on the 3553A factors. And, of course, this court determined that that was not true. Right, because that was pretty generic. But what I'm seeing Judge Stattmuller do here is touch, albeit briefly, but touch on the characteristics of this transaction, of this crime, and the characteristics of this defendant that particularly are driving his decision. And I think although the district court judge did touch on those facts, the district court judge didn't explain how those facts would be the same regardless of his findings. What more would he have to say for us to take seriously? I mean, he fully engaged on this sentencing. You've got a tough sentence in that there are, it's terrible conduct, very dangerous conduct, and you've got some powerful mitigating factors as well. And those are tough decisions for a district judge to make. And he's obviously wrestled with it, engaged with the specifics of the case. What more would he have to say to satisfy us and you that if we remand this, that 40 months is the appropriate sentence? Your Honor, I'm not sure what more he could have said in part because I don't either. It's very hard for me to see as well. And if you're not arguing, here's something you might be arguing. You might be saying in these instances where there's a difficult guidelines call, he at least perceived it as a difficult guidelines call, and there's a lot of evidence. Maybe that's the time when you have to go factor by factor under 18 U.S.C. Section 3553A and explain how all of them point you in a direction that leads to a 40-month sentence. Now, you'd have a hard time finding a case from this court that says that because what we say is normally the opposite. You don't need to march through them all in rigid fashion. You can just let us know which considerations were particularly persuasive to you. But maybe in these override situations you have to say more, but I think you would have a hard time finding support for that. Your Honor, our position is that the sentencing judge didn't adequately explain the procedural errors. I know that's your position. So Judge Hamilton's asking what would be adequate, and I'm proposing one approach, which would be if you actually step back and say, I am now going to go through and expressly discuss every factor under the statute so that the Court of Appeals and everybody else knows I really, really, really mean to override the sentencing guidelines here. But he does say he really, really means it on several occasions in this transcript. Well, I think that that would go to the substantive reasonableness of the sentence, whereas we're concerned primarily with the procedural reasonableness of the sentence. Well, it sounds like you're saying there's nothing the judge ever could say, and that would require us to overrule quite a lot of cases. Well, no, Your Honor. For example, something that the judge could have said. Well, then what kind of thing? I can ask you Judge Hamilton's question again. I'm sorry. I've been trying to get back to that question. I think one thing that the judge could have said is that, you know, I understand that the government's recommendation would drop by two years, but that would not change my sentence. I think that that would work. If he'd said that, that would be fine. That's what he said. He actually never said that in the sentencing transcript. What he did say was that even if the offense level dropped, he never addressed the change in the government's recommendation. The Supreme Court has told us that guideline errors can be raised for the first time on appeal and will treat them as plain errors and, in fact, usually treat them as prejudicial under Rosales-Morales, which led me to wonder if a district judge can ever inoculate a sentence under 3553A against a plain error remand on an issue that was never raised in front of her. I'm not sure I understand the question, Your Honor. Well, we have case law, and Asbury is an example, and there are others, where we say, in essence, we're not going to be satisfied with a generic conclusory. I would have done the same thing no matter what. And it helps if the district judge addresses the specific controversy about the guideline application, whether it's criminal history or offense level or whatever. But I wonder, maybe it's not possible, but if a district judge can say, basically, the guidelines for this crime are insufficient, they're not severe enough, or they're way too severe, and I'm just not going to rely on the guidelines at all in actually exercising my judgment under 3553A. I just wonder if that would be enough against a kind of plain error remand. Your Honor, I think the sentencing judge could have said that. In this case, of course, the sentencing judge didn't take issue with the guidelines directly. The sentencing judge didn't disavow them or criticize them. No, but he said he went below both the disputed ranges. Okay. Well, I see them at times. Thank you, Counsel. Ms. Biebel. Good morning, or is it afternoon yet? May it please the Court. Kate Biebel on behalf of the United States. Because this Court asked my colleague questions about harmless error, I'll start with that. Of course, the government agrees that any error in this case, procedural or clear, was harmless, and I agree with Judge Wood that Judge Stattmiller in this case made it plain that he would impose the same 40-month sentence, regardless of the enhancement. In fact, he used the word it should be crystal clear, and he said that twice. My colleague made the point that if the enhancement did not apply, the government's recommendation would be lower. What he fails to mention is that the plea agreement in this case, and in many cases that my office prosecutes, the plea agreement says that the government's recommendation will be X, Y, or Z, depending on the guidelines as the Court calculates them. And so the government's recommended sentence was going to be the low end of the guidelines, based on what the Court found the guidelines to be. And so the Court's finding that the enhancement did apply or didn't apply, and the resulting recommendation from my office was contemplated in the plea agreement, and the Court knew that. So on this guideline enhancement, it strikes me that it's pretty clearly incorrect for the Court to have done this, and it's actually interesting that the Sentencing Commission is now looking at a different guideline that would be applicable here, that would just be a two-level increase, but that would get rid of this knowingly problem. You're not going to have to know that it's fentanyl. This is very specific, and I found unpersuasive arguments that it's chalky at the price and all of this. One could easily think something is counterfeit or something is laced with another substance without jumping to fentanyl as the thing that is in there. I saw no evidence of that. Thank you, Your Honor. So as to your first point about the proposed amendment to the guidelines on this enhancement, that preliminary proposed amendment from January of this year would allow for a two-level increase when the defendant has a reason to believe that the drug that he's selling is actually something else. Right, and so that looks tailor-made for Mr. Edewa, unlike the actual guideline that we have right now. Now, of course, as you say, this is in an early stage. We don't know what will come out at the end of the day, but it was just interesting to me to see the contrast between the way that one is worded and suggests that the Sentencing Commission realizes that there may be a mismatch with this one that we have. Well, I agree, Your Honor, that that proposed two-level enhancement would match these facts absent this incriminating text message in which someone whom the defendant trusted told him that his product contained plant milk. So before that, before he got that text message, the evidence that he had before him informing his knowledge about the contents of his pills were the things that Your Honor mentioned already, that they are very chalky and brittle. They break easily. He can sell them for an inexpensive price, meaning he likely was buying them for an inexpensive price. All of those things would indicate to him, in particular, an experienced drug dealer, that what he was selling was inauthentic, and then he was marketing it as authentic Percocet. So those facts, those fall into this proposed two-level enhancement for selling something as a genuine pill that you have reason to believe is counterfeit. But in this case, we have a text message, like I said, from someone who the defendant trusted. Yeah, then he OD'd because they not even Perc's bro. It's straight FN phenol bro. So we have to interpret phenol to mean fentanyl. Right, and there wasn't a dispute about that at the sentencing, in the memos, or at the hearing. The parties understood, as the court did, that this text message is about fentanyl in Mr. Ahedewa's pills. But there were other disputes about the text message. Who sent it? Was it forwarded? Things like that. Yeah, certainly. The defendant's position about this particular text message at the time of the sentencing memos, or I should say the submissions to the PSR writer, were that Bobby Felicelli, the author of this text message, when confronted about what it meant, said, no, no, that text message wasn't about pills from Ahedewa. It was about someone else completely, and I was just venting. And that was memorialized in a defense investigator's affidavit and submitted along to the PSR writer. Then by the time we get to sentencing, Mr. Felicelli had emailed, unprompted, this AUSA, and said, actually, that was a forwarded message, and by the way, Mr. Ahedewa shouldn't be punished severely for selling those pills because it wasn't his fault. They were pushed on him by somebody else. In other words, acknowledging that he knew that Mr. Ahedewa was selling pills and also acknowledging that what he had told the defense investigator and what was memorialized in that affidavit was not true. And so at this point, by the time we get to the sentencing hearing, there are inconsistent stories from the person who wrote this text, and as the government pointed out at sentencing, there are reasons why Mr. Felicelli would try to fabricate the meaning of those messages at that point. The true meaning of it in the government's view and what the court believed is that they made Felicelli part of a criminal scheme. The text message was him saying, I bought these from you. I sold them to somebody else, and that guy almost died. And he is good friends with Mr. Ahedewa. There are other text messages the government pointed out throughout his phone, Mr. Ahedewa's phone, that show that they were close friends. At one point, Felicelli said that he loved him, and so he has a motive to protect him. And so all of those things are true, and the court, when it got to sentencing, said what Mr. Felicelli said to the investigator and what he sent in an email to the government, those things, in the judge's words, are not worth the paper they're written on. He relied on the plain meaning of the text message that was sent contemporaneously to this conversation that Felicelli was having with Ahedewa, and he credited the government's interpretation of that text message. But the only problem with all of that, which does hold together in some ways, but is that repeatedly you see the district judge putting this evidence through the wrong filter, putting it through the reasonableness, should have known, on notice filter, not the knowing filter. And he says, for reasons that I don't quite understand, that things are confusing about what knowing means. I didn't think they were, and I'm not quite sure what he was saying about the Court of Appeals either, but he says a lot of different things, most of which take you to a reasonableness standard, which is not what this guideline is looking for. Yes, Your Honor. I agree that this guideline, and specifically knowledge as proven by deliberate avoidance, is not a reasonable person standard. It's not an objective one, and I agree that the court used the term reasonable person on a number of occasions during the sentencing argument, but I would disagree that what he was doing was applying a reasonable person standard. He was taking into context the characteristics of this particular defendant, his status as a longtime drug dealer, what he knew about his own product, implicitly his motivation to know what is in the product that he's selling as genuine Percocet, because if his downstream buyers overdose and die, that affects his business. And so all of those things are part of the analysis in whether this particular defendant was unnaturally silent when Mr. Felicelli told him, hey, these pills contain fentanyl. And I'll turn this court's attention to Macias, which I agree with my colleague from his briefing, is very instructive in this case. In Macias, this court reiterated that deliberate avoidance of guilty knowledge is a strong suspicion plus some active step to avoid having that suspicion confirmed, and that active step can be a psychological one. The way that the Macias court described it is being silent when being silent would be unnatural. And so in that case, the defendant was a money launderer for a drug organization whose job it was to launder the proceeds.  And he argued that he didn't know the money he was moving came from drug smuggling. He thought it came from human smuggling, which would put him out of the knowledge requirement for the purposes of this conspiracy. It wasn't unnatural for him not to ask follow-up questions because he had previous experience in human smuggling, and the person who recruited him to the conspiracy told him that the proceeds came from human smuggling. So there wasn't this red flag moment where this was an argument in medication. I'm sorry? This was an argument in medication. Yes. I'm just, okay. This, in Macias, this defendant also, he didn't have reason to be suspicious or even wonder at all about the source of the money because he was a money launderer and it didn't matter to him, which is different from my head over here. I see that I'm out of time, Your Honors, if there are any further questions. I see none. Thank you. Thank you very much. I think, Mr. Kent, you had a few seconds left. Anything further? A few. Three. I'll round it up to 30. It's an order of magnitude increase. I think, you know, just really quickly, I'd like to take another crack at Judge Hamilton's question. I think what the sentencing judge could have done here is he could have, you know, explicitly stated that the change in the recommendation wouldn't have affected the sentence, and I think that he could have explicitly stated that the 3553A factors were strong enough to overcome that change in recommendation. Neither of those things occurred in this case, but I think that that would have been enough. Thank you. Okay. Thank you very much, Mr. Kent. The case is taken under advisement and the court will be in recess.